**In re EDISON BROTHERS, INC., et al., Debtors.**

**EBS Pension L.L.C., Plaintiff,**

**v.**

**Edison Brothers Stores, Inc., et al., Defendants.**

**Bankruptcy Nos. 99–529(MFW) to 99–536(MFW). Adversary No. 99–115(MFW).**

United States Bankruptcy Court, D. Delaware.

Jan. 7, 2000.

---

5. Just as in *White*, it is not here necessary for the Court to examine the cases dealing with

"modifications" under 11 U.S.C. § 1329.

Harvey R. Miller, PC, Richard P. Krasnow, Weil Gotshal & Manges, LLP, New York City, for debtors.

Laura Davis Jones, Joel A. Waite, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Co–Counsel for debtors.

Richard A. Chesley, Toni–Ann Citera, Mark A. Cody, Jones, Day, Reavis & Pogue, Chicago, IL, for EBS Pension, LLC.

William P. Bowden, Christopher S. Sontchi, Ashby & Geddes, Wilmington, DE, Co–Counsel for EBS Pension, LLC.

Thomas M. Mayer, Kramer Levin Naftalis & Frankel, LLP, New York City, for Official Committee of Unsecured Creditors.

Neal J. Levitsky, Agostini, Levitsky, Isaacs & Kuleska, Wilmington, DE, Co–Counsel for Official Committee of Unsecured Creditors.

John D. McLaughlin, Daniel K. Astin, Office of U.S. Trustee, Philadelphia, PA.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

## I. INTRODUCTION

This matter is before the Court on the Motion for Summary Judgment of EBS Pension L.L.C. ("EBS") and the Cross Motion for Summary Judgment filed by the Debtors.[2] Because there are material

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2. The Debtors are Edison Brothers Stores, Inc., Edison Brothers Apparel Stores, Inc., Edison Paymaster, Inc., Edison Missouri Realty Company, Inc., Edison Indiana, LLC, Ed-

issues of disputed fact, both Motions will be denied.

## II. *JURISDICTION*

This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (O).

## III. *FACTUAL BACKGROUND*

On November 3, 1995, Edison Brothers Stores, Inc. ("Edison") and its sixty-five affiliates commenced their first chapter 11 cases. On September 9, 1997, an Order was entered in those cases confirming the Amended Joint Plan of Reorganization of Edison and its affiliates ("the First Edison Plan"). The effective date of that Plan occurred on September 26, 1997.

As part of the First Edison Plan, Edison obtained approval to terminate its overfunded pension plan. Pursuant to the First Edison Plan and the EBS Pension, L.L.C. Members Agreement, EBS was formed for the sole purpose of collecting the excess proceeds from the pension plan and distributing it to the general unsecured creditors. The excess proceeds were defined in the First Edison Plan as all rights which Edison had to the funds in the terminated pension plan net of the funds transferred to a new qualified pension plan and related costs and taxes associated with the termination of the old pension plan and establishment of the new pension plan. Because it could not be ascertained what tax liabilities might arise from the termination, the First Edison Plan provided that the Debtors "will reserve $7,000,000 from the Pension Plan Proceeds in order to fund any taxes that may arise as a result of the termination of the Pension Plan.... The $7,000,000 reserved amount, less any taxes required to be paid in connection with termination of the Pension Plan, shall be transferred by the Reorganized Debtors to the EBS Pen-

sion, L.L.C. as soon as practicable after the issuance of [a letter ruling by the IRS determining the amount of taxes due]." (*See* Disclosure Statement related to the First Edison Plan at p. 40, attached as Exhibit A to the Complaint.)

A letter ruling from the IRS was obtained on September 28, 1998, stating that no additional taxes were due. EBS thereupon made demand on Edison for turnover of the Tax Reserve Fund. Edison refused, citing an audit being conducted by the Pension Benefit Guaranty Corporation regarding the level of funding of the new pension plan. That audit was apparently later concluded, with no additional funding required.

On March 9, 1999, the Debtors filed their second chapter 11 cases. The Debtors listed EBS as a general unsecured creditor in the amount of $5.7 million.

On April 23, 1999, EBS filed the instant adversary against the Debtors seeking a declaratory judgment that all moneys in the Tax Reserve Fund are held by the Debtors in constructive trust for EBS and, therefore, are not property of the Debtors' estate. The Debtors filed an Answer denying that the Tax Reserve Fund was a constructive trust and asserting that the funds were never segregated but were commingled with the Debtors' general working capital funds and dissipated between the time the Debtors emerged from the first bankruptcy cases and the time they filed their second bankruptcy cases.

A Motion for Summary Judgment on the Complaint was filed by EBS on June 16, 1999, and a Cross Motion for Summary Judgment was filed by the Debtors on July 30, 1999. The Motions have been fully briefed.

## IV. *DISCUSSION*

### A. *Summary Judgment Standard*

Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 of the Federal

ison Puerto Rico Stores, Inc., Tofac of Puerto Rico, Inc. and Edison Brothers Stores Inter-

national, Inc.

Rules of Civil Procedure in adversary actions. Under Rule 56, the court may grant summary judgment if the moving party establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must assume that undisputed facts set forth in the record are true. *In re Trans World Airlines, Inc.*, 180 B.R. 386, 387 (Bankr.D.Del.1994). Once the moving party has supported its motion, the burden shifts to the non-moving party to demonstrate that material issues of fact exist so as to make the grant of summary judgment inappropriate. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. *Property of the Estate*

EBS's Complaint is premised on section 541(d) of the Bankruptcy Code which states, in relevant part:

> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

■ Thus, courts have concluded that property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy. *See, e.g., In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1059 (3d Cir.1993)("Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust").

## C. *Constructive Trust*

The parties do not agree, however, whether state law or federal common law governs the creation of a constructive trust.

### 1. *Federal Common Law Applies*

■ EBS relies principally on *Columbia Gas* in arguing that federal common law applies. In that case, the Third Circuit found that federal common law applied to the issue of whether funds collected by the debtor under the Natural Gas Act ("NGA") were held in constructive trust and, therefore, excluded from property of the estate under section 541(d) of the Bankruptcy Code. 997 F.2d at 1058.

EBS argues initially that *Columbia Gas* stands for the broad proposition that all issues regarding what is a constructive trust under section 541(d) are determined by federal common law. In *Columbia Gas*, the Third Circuit concluded that:

> Application of state law not only would frustrate the purpose of the NGA, but also would warp the definition Congress intended to provide to the exclusion from the bankruptcy estate for equitable interests. *See* 11 U.S.C. § 541(d). The legislative history of section 541(d) makes clear that when a debtor collects money on behalf of another, this money is held in constructive trust for the intended eventual recipient even absent any misconduct. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 368 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6324. Since in some cases state law is inconsistent with this definition, it must be displaced.

*Id.* at 1056.

In reaching its conclusion, the Third Circuit relied on the decision of the Supreme Court in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979):

> In *Kimbell Foods*, the Supreme Court outlined the analysis that determines whether uniform federal common law or state law should apply. The determina-

tion depends on the nature and importance of the government interest at issue and the effect of applying state law. *Kimbell Foods,* 440 U.S. at 727–28, 99 S.Ct. at 1458. To decide whether a national federal rule is necessary, courts should consider: (1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern. . . . Developing a federal common law rule is the exception rather than the rule. Federal law should coincide with the relevant state law unless state law would undermine the objectives of the federal statutory scheme and there is a distinct need for nationwide legal standards.

997 F.2d at 1055 (citations omitted).

The Third Circuit concluded that there was a need for a national uniform law in *Columbia Gas* because, in addition to furthering Congress's intent as embodied in section 541(d) of the Bankruptcy Code, it preserved the federal policy articulated in the NGA, which sought to supersede private contract rights and "should not be subject to the vagaries of state trust law." *Id.* Further, it found that application of state trust laws (which may require a bad act or unjust enrichment before a finding of a constructive trust could be made) would frustrate the purposes of the NGA and the Bankruptcy Code. *Id.* at 1056. Finally, the Court concluded that applying federal common law in that case would not upset commercial expectations, because the parties could not reasonably assume that state law would apply to the federally created rights under the NGA. *Id.*

■ The Debtors argue, however, that the *Columbia Gas* case does not stand for the broad proposition that federal common law must apply to all determinations of whether a trust arises under section 541(d) and that the application of a *Kimbell Foods* analysis is required in each case

under section 541(d). We disagree. The Third Circuit clearly stated that, because of *Kimbell Foods,* state law of constructive trusts "must be displaced" by a federal common law in cases under section 541(d). 997 F.2d at 1056. It found support for this conclusion in the legislative history of section 541(d).

> For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, *the payment would actually be held in constructive trust for the person to whom the bill was owed.* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 368 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6324 (emphasis added).

997 F.2d at 1059. That example makes no mention of state law of constructive trusts and is consistent with the federal common law of constructive trusts. (*See* discussion at Part C2 *infra.*) Clearly, the Third Circuit conclusion was meant to apply to all determinations of trust under section 541 and was not limited to the facts of that case (that is, to circumstances where the NGA is implicated).

Even if we were required to perform a *Kimbell Foods* analysis in each case, however, we would conclude that federal common law should apply in this case. First, there is a need for a uniform national law. As the Third Circuit stated in *Columbia Gas,* section 541 of the Bankruptcy Code itself is an articulation of Congress's intent to provide uniformity in this area. 997 F.2d at 1056.

Further, this case implicates not only the Bankruptcy Code but also the Employment Retirement Income Security Act of 1974 ("ERISA"). The Debtors argue, however, that the rights asserted by EBS in the Tax Reserve Fund do not arise under ERISA or the Bankruptcy Code (such as avoidance actions do) but rather

under the terms of the First Edison Plan, which is essentially a contract between the parties. *See, e.g., Hillis Motors, Inc. v. Hawaii Auto. Dealers Ass'n,* 997 F.2d 581, 588 (9th Cir.1993)(plan of reorganization should be construed "basically as a contract"); *Breeden v. Bennett (In re Bennett Funding Group, Inc.),* 220 B.R. 743, 758 (Bankr.N.D.N.Y.1997) ("because there is little need for a nationally uniform body of law regarding interpretation of Chapter 11 plans and because state law is regularly incorporated into bankruptcy law, state law constitutes the federal rule of decision" when interpreting plans of reorganization).

However, EBS's claims to the funds are not simply contractual in nature, they are derivative of the Debtors' rights to the balance of the overfunded pension plan. The Debtors transferred to EBS all rights they may have to the funds, which rights arise under, and are impacted by, ERISA. In fact, the First Edison Plan acknowledged as much by providing that the Tax Reserve Fund would first be used to pay any obligations that the Debtors might incur (under ERISA or the Internal Revenue Code) as a result of the termination of the pension plans.

Further, since the parties to a bankruptcy case can expect many of their rights to be determined under federal law, use of federal common law in this instance would not frustrate their commercial expectations.

Therefore, the issue of whether a constructive trust arose in favor of EBS in the Tax Reserve Fund under section 541(d) of the Bankruptcy Code must be determined by application of federal common law.

2. *Application of Federal Common Law*

■ Applying federal common law in the *Columbia Gas* case, the Third Circuit concluded that a constructive trust arose in customer refunds collected by the debtor. 997 F.2d at 1062. That conclusion was premised largely on the fact that the debtor was merely a conduit for those funds and had no interest in them. *Id.*

at 1059–62, *citing In re United Milk Products Co.,* 261 F.Supp. 766 (N.D.Ill.1966)(holding milk product manufacturer which received payments from a settlement fund for its suppliers held those funds in trust).

■ In applying the federal common law to determine whether a constructive trust arises, the Third Circuit has highlighted several other factors, not all of which need be present. One factor is whether the parties articulated an intention to create a trust, although the "failure to expressly designate the relationship as one of trust does not necessarily negate its existence." *Columbia Gas,* 997 F.2d at 1060, *quoting In re Penn Central Transportation Co.,* 486 F.2d 519, 524 (3d Cir. 1973)(en banc), *cert. denied* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). Obviously, constructive trust cases, unlike express trust cases, do not typically contain such express declarations of trust.

However, the documents that were drafted in this case do support the conclusion that a constructive trust was intended. Under the First Edison Plan, the Debtors transferred all their rights in the pension plan funds to EBS. Their retention of the Tax Reserve Fund was consistent with (not contrary to) this intention. The Debtors were not entitled to use the Tax Reserve Fund, except to pay taxes or other costs directly associated with termination of the old pension plan (*i.e.,* obligations that EBS would have as assignee of the Debtors' interest in the pension plan). For example, the Debtors acknowledge that they were required to, and did, reserve the funds in question on their books. This is further evidence that those funds were intended to be held in constructive trust for EBS (or the IRS).

The Debtors' argument that no constructive trust was created because the First Edison Plan did not require that the Tax Reserve Fund be segregated or escrowed simply begs the question. If the First Edison Plan required that the funds be segregated or escrowed it might sup-

port a finding of an express trust, but segregation is not a prerequisite to a finding of a constructive trust.

In the *Penn Central* case, the Court found a trust where the railroad had acted "merely as a receiving and transmitting agent" in collecting fees from end users for the use of tracks owned by the other railroads. 486 F.2d at 523–24. This role of receiver of funds due to another is analogous to the example of a constructive trust cited in the legislative history to section 541 (the debtor who receives payment from his insurance company for medical bills incurred). *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 368 (1977). It is also analogous to the debtor in *Columbia Gas* which received customer refunds from upstream providers. 997 F.2d at 1062. All are examples of constructive trusts. Similarly, the Debtors in this case were merely the conduits through which the pension funds were to be paid either to the IRS or to EBS, according to the dictates of ERISA and the Internal Revenue Code. The Debtors had already relinquished any entitlement they may have had to those funds by the terms of the First Edison Plan. After its confirmation, they had no equitable interest in those funds but merely held them for the benefit of others.

■ Another factor cited by the *Penn Central* Court in determining whether a constructive trust exists is the absence of any provision for the payment of interest. 486 F.2d at 524. The Third Circuit explained this factor in *Columbia Gas:* "One party permitting another to use its money for a period of time in exchange for the payment of interest is the hallmark of a debtor-creditor relationship. Therefore, the absence of interest payments ... counseled in favor of finding a trust." 997 F.2d at 1060. Similarly, in this case there was no provision for the payment of interest on the Tax Reserve Fund by the Debtors to EBS. This is consistent with a constructive trust.

■ Another indicia of a constructive trust is the segregation of the funds. However, the *Penn Central* and *Columbia Gas* Courts did not find that to be a decisive factor, because of the difficulty in those cases of maintaining numerous segregated accounts. *See Penn Central,* 486 F.2d at 525; *Columbia Gas,* 997 F.2d at 1060. The Debtors in this case argue that, since there is only one account at issue here, the failure to segregate is significant and mandates a determination that no constructive trust arose. However, segregation is merely one factor in determining whether the parties intended to create a trust; it is not dispositive. In this case, there are sufficient other factors evidencing such intent, as noted above.

We conclude, therefore, that a constructive trust under federal common law did arise for the benefit of EBS in the Tax Reserve Fund.

### D. *Identification of Res*

■ "In order to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled." *Goldberg v. New Jersey Lawyers' Fund,* 932 F.2d 273, 280 (3d Cir.1991). The identification of the trust funds is a question of federal law. *See id.* and cases cited therein.

The Debtors argue that EBS cannot meet this second requirement because the Debtors did not hold the Tax Reserve Fund in a separate account, but commingled those funds in their general operating account. They assert, therefore, that EBS will not be able to trace the trust funds thereby defeating its claim.

However, the Supreme Court (and the Third Circuit) have cast doubt on this strict interpretation. In *Begier v. IRS,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), the Supreme Court held that the Bankruptcy Code had effectively overruled its earlier decision in *United States v. Randall,* 401 U.S. 513, 91 S.Ct. 991, 28

L.Ed.2d 273 (1971). The *Randall* decision had held that the IRS (even if it had a constructive trust for withholding taxes) could not receive payment ahead of other priority claims where the funds had been commingled, because of the strict priorities established by the Bankruptcy Act. The Supreme Court in *Begier* held that Congress, in enacting the Bankruptcy Code—and in particular section 541(d) of the Code—had overruled the *Randall* decision. *Begier,* 496 U.S. at 65, 110 S.Ct. 2258. The *Begier* Court noted that the legislative history to section 541(d) evidenced Congress's intention to preclude even commingled trust fund taxes from becoming property of the estate: "These amounts [of withheld trust fund taxes] will not be property of the estate regardless of whether such amounts have been segregated from other assets of the debtor by way of a special account, fund, or otherwise, or are deemed to be a special fund in trust pursuant to provisions of applicable tax law." *Id.* at 64, 110 S.Ct. 2258, *quoting* S.Rep. No. 95–1106 at 33. Rather than a strict identification of the trust funds, Congress suggested a looser standard: "The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, and other tax authorities, can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case." 124 Cong. Rec. at 32417.

Consequently, the *Begier* Court held that to establish its claim to trust fund taxes, "the IRS would have to show some connection between the ... trust and the assets sought to be applied to a debtor's trust-fund tax obligations." 496 U.S. at 65–66, 110 S.Ct. 2258. In the *Begier* case, the Court found that the IRS had established that connection: "[T]he debtor's act of voluntarily paying its trust-fund tax obligation [pre-petition] therefore is alone sufficient to establish the required nexus between the 'amount' held in trust and the funds paid." *Id.* at 66–67, 110 S.Ct. 2258.

In interpreting the *Begier* decision in the *Sharon Steel* case, the Third Circuit rejected an argument almost identical to the Debtors' in this case.

Nevertheless Sharon Steel argues that as "it is undisputed that the [t]axes were not held in a segregated account ... [or] paid prepetition, ... the required nexus *cannot* be established." Brief at 13 (emphasis added). But its argument misconstrues *Begier*'s nexus requirement, because it contemplates that the nexus requirement is met *only* if the employer had segregated the trust fund taxes or transferred them to the taxing authority before the petition. Yet *Begier*'s reliance on Representative Edwards' remarks shows that the taxing authorities should be able to show that the nexus requirement is satisfied in other ways.

*City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 101 (3d Cir.1994). In determining what might constitute a sufficient nexus, the Third Circuit suggested that application of the lowest intermediate balance test ("the LIBT") might be one method. However, it did not hold that to be the only means to satisfy the standard:

At this time we do not decide definitively that the district court and the bankruptcy court must apply the LIBT .... But ... we recognize that the LIBT may constitute a "reasonable assumption[ ] under which the Internal Revenue Service, and other taxing authorities, can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case."

*Id.* at 102–03.

The Third Circuit further stated that "when applying the guidelines we set forth to determine whether a nexus exists, the bankruptcy court certainly should keep in mind the broader policy against allowing a party unilaterally to make a trust unenforceable by commingling assets." *Id.* at 102, n. 10.

Although both the *Begier* and the *Sharon Steel* cases dealt with taxes, they apply equally to all constructive trust cases under section 541(d). In *Begier*, the Supreme Court found that trust fund taxes were encompassed within the broader concept of a trust contemplated by section 541(d).[3]

■■■ Applying the holdings of *Begier* and *Sharon Steel* to the facts of this case, we cannot grant the motion for summary judgment filed by the Debtors. That motion is premised on the broad assertion that the commingling of funds pre-petition mandates a finding in its favor, an argument expressly rejected by the Third Circuit in *Sharon Steel*. Similarly, we cannot conclude that EBS is entitled to judgment on its motion simply because it has established that a constructive trust in its favor arose pre-petition. EBS must also establish a second element: that a nexus exists between its constructive trust and the funds in the Debtors' possession as of the filing date.[4] This is a material, and disputed, issue of fact.

Although using the lowest intermediate balance test will satisfy the nexus requirement, it is not the only way it can be met. The Supreme Court and the Third Circuit have held that the nexus must be determined in light of all circumstances. This would permit us to look at the commercial realities of how the Debtors conducted business. For example, it may be possible to establish a sufficient nexus by showing that, notwithstanding the sweep of all funds into a concentration account and the application of those funds to a revolving line of credit (as the Debtors assert occurred here), there still remained sufficient borrowing availability (and lack of restrictive covenants) under the revolver to permit the Debtors to pay the Tax Reserve Fund to EBS at all relevant times. Just as commingling of funds does not defeat a constructive trust, so too the application of funds to pay down a line of credit, which immediately thereafter has sufficient availability, may provide a sufficient nexus to permit the recovery of the trust funds. This may be particularly true where, as here, all secured lenders have been repaid in full from the sale of other assets of the Debtors.

Thus, we must deny both motions for summary judgment and schedule an evidentiary hearing to determine whether EBS can establish the requisite nexus between funds held by the Debtors on the petition date and the constructive trust funds created by the First Edison Plan.

## V. *CONCLUSION*

For the foregoing reasons, the cross motions for summary judgment filed by EBS and the Debtors will be denied and a pretrial scheduled to determine what additional discovery is necessary before trial.

---

**3.** Originally, the Senate version of section 541(d) expressly included trust fund taxes as excluded from property of the estate whether or not such taxes are segregated from the debtor's general operating accounts. *See* S.Rep. No. 95–1106 at 33. The reference to trust fund taxes was deleted in the final version of the section as "unnecessary" because no funds held in trust would become property of the estate. 124 Cong. Rec. at 32417. *See also, Begier,* 496 U.S. at 64, 110 S.Ct. 2258.

**4.** The Debtors argue that we must determine whether the trust funds exist currently. However, the determination of what constitutes property of the estate is made as of the petition date. *See* 11 U.S.C. § 541(a). *Cf.* 11 U.S.C. § 541(a)(5) (property of the estate also includes some limited interests acquired by the debtor post petition).