UNITED STATES of America,
Appellant,

v.

Michael A. McCONNELL, Trustee of
the Bankruptcy Estate of Flying
Boat, Inc., Appellee.

In re Flying Boat, Inc. d/b/a Chalk's
International Airlines (formerly
Pan Am Air Bridge), Debtor.

No. 3:00–CV–925–M.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 2, 2001.

Robert C. McGuire, Dallas, TX, pro se.

Andrea Horowitz Handel, Attorney at Law, U.S. Dept. of Justice, Civil Division, Washington, DC, for appellant.

John David Penn, Attorney at Law, Haynes & Boone, Fort Worth, TX, for appellee.

### MEMORANDUM OPINION ON APPEAL AND CROSS– APPEAL

LYNN, District Judge.

This is an appeal from an Opinion and Order of the Hon. Robert C. McGuire, United States Bankruptcy Judge. Judge McGuire's Opinion of November 30, 1999 [1] addressed the objection of Michael A.

---

1. See 245 B.R. 241 (Bankr.N.D.Tex.1999).

McConnell, Trustee and post-confirmation Estate Representative of Debtor Flying Boat, Inc. ("Trustee"), to the claims of the United States Department of Agriculture ("USDA") and the Immigration and Naturalization Service ("INS"). For the reasons described below, Judge McGuire's Opinion and Order are **AFFIRMED** as to the claims of the USDA and **REVERSED** as to the claims of the INS.

On January 11, 1999, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Flying Boat, Inc. ("Debtor"). Thereafter, the USDA and the INS filed proofs of claim against Debtor for user fees collected by Debtor in connection with airline ticket sales. The INS filed a claim for international passenger inspection user fees pursuant to 8 U.S.C. § 1356, and the USDA filed a claim for user fees pursuant to 21 U.S.C. § 136a. Both agencies claimed that the fees were collected and held in trust by Debtor for the benefit of the agencies, and thus were not property of the estate under 11 U.S.C. § 541. The Trustee objected to the trust claims of the INS and USDA. The Bankruptcy Court, sustaining the Trustee's objection to the trust claim of the INS, held that the fees held by the Debtor, but claimed by the INS, were not held by the Debtor in express or constructive trust. In contrast, the Bankruptcy Court, denying the Trustee's objection to the trust claims of the USDA, ruled that the user fees claimed by the USDA were held by the Debtor in express trust for the USDA. Additionally, the Bankruptcy Court held that the USDA adequately traced those trust funds into the Debtor's accounts, by application of the lowest intermediate balance test. In an alternative ruling, the Bankruptcy Court stated that if its ruling regarding the INS user fees was incorrect, and those fees were held by the Debtor in trust for the INS, then the INS likewise satisfied its tracing obligation. In accordance with its Memorandum Opinion, on December 15, 1999, the Bankruptcy Court entered an Order allowing the INS a general unsecured claim for user fees of $35,434, and allowing the USDA a priority claim for user fees of $12,006.

In its appeal, the United States argues that the Bankruptcy Court erred in finding that the INS user fees were not held by the Debtor in trust. The Trustee cross-appeals, arguing that the Bankruptcy Court erred in its application of the lowest intermediate balance test to tracing of the USDA user fees, since in so doing it combined Bahamian accounts with United States accounts, although the evidence showed that the Bahamian accounts never contained user fees collected in the United States. This Court will address each argument in turn, analyzing factual disputes on a clearly erroneous basis, and the law on a *de novo* standard of review. FED. R. BANKR. P. 8013; *In re CompuAdd Corp.*, 137 F.3d 880, 881 (5th Cir.1998).

## A. INS User Fees

Section 541(a) of the Bankruptcy Code provides that the commencement of a bankruptcy case creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(d) provides that property "in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). A debtor "does not own an equitable interest in property he holds in trust for another, [so] that interest is not 'property of the estate.'" *Begier v. I.R.S.*, 496 U.S. 53, 59, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

The INS is authorized to collect from passengers arriving at ports of entry in the United States a fee of $6 per individual, for immigration inspections of each passenger. 8 U.S.C. § 1356(d). The entity that issues the ticket to the passenger, in this case the Debtor, collects the fee from

the passenger at the time of issuance of the ticket. 8 U.S.C. § 1356(f); 8 C.F.R. §§ 286.4–.5. The user fees collected must be remitted to the INS, within thirty-one days after the close of the calendar quarter in which the fees are collected. 8 C.F.R. § 286.5(b). Although unlike that applicable to the USDA, the INS user fee statute does not use the word trust to describe the holding of the fees, and this Court thus does not conclude an express trust exists, the Court must analyze whether a constructive trust exists.

This case is very similar to the Third Circuit case of *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994). There, Columbia Gas, the debtor, owned a natural gas pipeline, and was thus extensively regulated by the Federal Energy Regulatory Commission ("FERC"). After filing for bankruptcy, Columbia, as a debtor in possession, filed a motion requesting authority to pay certain pre-petition obligations. One set of alleged obligations consisted of overcharges that, pursuant to a FERC Order, Columbia had collected from gas producers, to refund such sums to Columbia's customers. Another set of obligations arose out of FERC-approved surcharges that Columbia (and other pipelines) had collected from customers and owed to the Gas Research Institute, a non-profit organization that managed research and development projects related to natural gas production and transportation. *Id.*

The Third Circuit began its analysis of whether the funds at issue were held in trust by deciding to apply federal common law. The Third Circuit noted that, while federal law governs questions involving the interpretation of a federal statute, federal courts applying federal law can "either fashion a uniform federal common law rule or adopt state law as the federal rule of

decision." *Id.* at 1055. To determine whether uniform federal common law or state law would apply, the Third Circuit stressed that such a determination "depends on the nature and importance of the government interest at issue and the effect of applying state law." *Id.* (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)). In deciding whether a national federal rule is necessary, the Third Circuit emphasized that a court should consider: "(1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern." *Id.*

Looking at the first prong of the analysis, the court in *Columbia Gas* held that a national uniform law was necessary, since the monies at issue were collected as a result of orders of a federal agency, pursuant to federal law, and private parties could not alter the orders by contract. "Because [the funds] arise directly from federal law and implement the central objective of [the federal statute], the property rights Columbia has in these [funds] should not be subject to the vagaries of state trust law." *Id.*

▇▇▇ Noting that federal common law generally provides a more expansive definition of an implied trust than does state law,[2] the Third Circuit, in applying the second prong of *Kimbell Foods*, found that applying state law to the determination of Columbia's property rights would frustrate the objectives of the federal program at issue. *Id.* at 1056. The purpose of that federal program was to provide natural gas to the public at reasonable rates, and state law that would only recognize a con-

---

**2.** The court below found, and this Court agrees, that under Texas law, for a constructive trust to exist there must be a breach of fiduciary relationship or actual fraud. *See In re Haber Oil Co.*, 12 F.3d 426, 435 (5th Cir.

1994). Federal common law is more expansive. *See In re Penn Cent. Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir.1973) (*en banc*), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).

structive trust in instances of wrongdoing by the debtor would thwart that purpose. The court noted that "[f]ederal common law imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient." *Columbia Gas,* 997 F.2d at 1056. Significantly, the Third Circuit noted that application of state law would not only frustrate the purpose of the federal program, but would also "warp the definition Congress intended to provide to the exclusion [at § 541(d) ] from the bankruptcy estate for equitable interests." *Id.* Since state law would sometimes include in estates interests that Congress meant to exclude, the Third Circuit decided that state law must be displaced. *Id.*

Addressing the third and final prong of *Kimbell Foods,* the Third Circuit determined that application of federal common law would not upset commercial expectations that state law would govern. "Creditors cannot reasonably assume that state law will allocate various parties' interests in federally created property rights." *Id.*

The Bankruptcy Court below differentiated *Columbia Gas* as being "concerned with the protection of public rights, consumer rights, or [a] specific industr[y]." *In re Flying Boat,* 245 B.R. at 248. Although *Columbia Gas* involved those factors, this Court does not believe this case is distinguishable from *Columbia Gas* on that basis.

■ The INS user fees involved in the instant case were prescribed by federal statutes and regulations, and private parties have no power to alter any such fees. The fees are designed to implement an essential duty of the INS, conducting immigration inspections. Varying state laws should not create a property right in the collecting party with respect to these fees. As the Fifth Circuit held in another context:

[I]f the adoption of state law as the federal rule would frustrate federal policies or otherwise interfere with the authority and duties of the United States

... federal common law must be applied irrespective of state interests.... The most obvious example in which the authority and duties of the United States as sovereign would be intimately involved is a controversy whose outcome will have an immediate effect on the federal treasury.

*Bynum v. FMC Corp.,* 770 F.2d 556, 568 (5th Cir.1985). If some portion of user fees collected are not available to fund immigration inspections, due to bankruptcy of the debtor, the treasury will be affected.

As to the second *Kimbell Foods* prong, application of state law in this instance would frustrate the objectives of the INS user fee statute. The immigration inspection fees are used to facilitate the inspection of passengers entering the United States. If Texas law were applied in situations like the one at hand, the objectives of the federal program would be frustrated, and Congress's objective of having monies collected in order to pay for the inspection of passengers would thereby be subverted.

Finally, as in *Columbia Gas,* "[c]reditors cannot reasonably assume that state law will allocate various parties' interests in federally created property rights." 997 F.2d at 1056. Application of the federal common law rule would not upset commercial expectations that state law would govern.

■ The three prongs of the *Kimbell* test having been satisfied, this Court must next determine whether federal common law would impose a constructive trust based on the facts of the present case. Congress has specifically addressed the issue of whether an entity is a conduit for such funds:

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insur-

ance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed.

H.R. REP. No. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6324, *quoted in Columbia Gas,* 997 F.2d at 1059; *T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372, 1376 (11th Cir.), *cert. denied,* 493 U.S. 846, 110 S.Ct. 139, 107 L.Ed.2d 98 (1989).

In determining that the debtor in *Columbia Gas* was holding funds in constructive trust, the Third Circuit considered a number of factors. *Columbia Gas,* 997 F.2d at 1060–61; *In re Penn Central Transp. Co.,* 486 F.2d 519 (3d Cir.1973) (*en banc*), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). As in the present case, the collection and distribution mechanisms for the refunds in *Penn Central* were created by statute. *Columbia Gas,* 997 F.2d at 1060. The Third Circuit also noted that the debtor did not distribute funds for goods or services rendered. Instead, it merely acted as a receiving and transmitting agent for the funds. *Id.* at 1061. Similarly, here the Debtor would collect inspection fees from passengers and then transmit them to the INS. The INS did not receive these funds for goods or services it rendered to Debtor; the Debtor's sole role was to more easily facilitate the collection by the INS of passenger inspection fees. The fact that the INS did not charge Debtor interest for funds timely remitted also confirms the trust relationship. *Id.* If the funds were not the Debtor's, it would owe no interest for holding them. This case strongly parallels the situation in *Columbia Gas* and dictates the same conclusion: the INS immigration inspection fees were held in constructive trust by the Debtor. *See also T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372 (11th Cir. 1989), *cert. denied,* 493 U.S. 846, 110 S.Ct.

139, 107 L.Ed.2d 98 (1989); *In re United Milk Prods. Co.,* 261 F.Supp. 766 (N.D.Ill. 1966); *Yonkers Bd. of Educ. v. Richmond Children's Ctr., Inc.,* 58 B.R. 980 (S.D.N.Y. 1986); *In re Edison Bros., Inc.,* 243 B.R. 231 (Bankr.D.Del.2000).

## B. Tracing of Funds

■ As the court held in *Columbia Gas,* the party claiming the existence of a trust "bear[s] the burden of identifying and tracing [the] trust property." *Columbia Gas,* 997 F.2d at 1063. The Bankruptcy Court applied the lowest intermediate balance test as the correct method for tracing the funds which it found were held in trust by the Debtor for the USDA, and then found that if, contrary to its holding, the INS user fees were held by the Debtor in trust, they were similarly traced by virtue of the intermediate balance test because the Bankruptcy Court found that the USDA (and, conditionally, the INS) satisfied its tracing burden since the Debtor's combined credit card, payroll, Bahamian and American operating accounts never dipped below the amount of the USDA (and INS) claim. The Trustee appeals, arguing that the Bankruptcy Court erred in consolidating the operating accounts in performing the lowest intermediate balance test.

On behalf of the agencies, the United States also complains of the Bankruptcy Court's tracing analysis, contending that the user fees are not subject to common-law tracing principles like the lowest intermediate balance test, but rather are subject to the "reasonable assumption" standard set forth in *Begier,* 496 U.S. at 67, 110 S.Ct. 2258. *Begier* involved a commercial airline required to withhold federal income taxes and FICA from its employees' wages, and excise taxes from its customers, to be held in a special fund, in trust, for the IRS. 42 U.S. § 7501. The airline fell behind in its payments to the IRS. The IRS ordered the airline to establish a separate bank account for all of the taxes. Although the account was estab-

lished, the airline did not deposit sufficient funds to cover its full tax obligations. However, the airline remained current on its tax obligations, paying the IRS from both the separate account and from its general operating funds. The airline subsequently declared bankruptcy. *Begier,* 496 U.S. at 56, 110 S.Ct. 2258.

The bankruptcy trustee sought to avoid the tax payments as preferences. The United States Supreme Court affirmed the Third Circuit's holding that the funds were not the debtor's property, and thus a payment to the IRS was not an avoidable preference. The Court concluded that it was a "reasonable assumption" that a voluntary pre-petition payment of taxes out of the debtor's assets is not a transfer of the debtor's property. *Id.* at 66, 110 S.Ct. 2258. The Supreme Court further noted that "[u]nlike a common-law trust, in which the settlor sets aside particular property as the trust res, § 7501 creates a trust in an abstract 'amount'—a dollar figure not tied to any particular assets—rather than in the actual dollars withheld." *Id.* at 62, 110 S.Ct. 2258. The Court noted that a § 7501 trust was "radically different from the common-law paradigm . . . ." *Id.*

The Bankruptcy Court correctly held that since this case does not involve a § 7501 or a similar trust, *Begier* is distinguishable. The INS user fees were held in a constructive trust under federal common law and the applicable statute created an express trust in the USDA "fees collected." 21 U.S.C. § 136a(a)(3). Further, this Court agrees with those courts that have held that a voluntary pre-petition payment is necessary in order to apply the "reasonable assumption" standard of *Begier. See, e.g., In re Wellington Foods, Inc.,* 165 B.R. 719, 728 (Bankr.S.D.Ga.1994) ("[W]here there has been no voluntary payment, [the government] is still required to establish some sort of nexus through the use of traditional trust-fund tracing rules, such as the 'lowest intermediate balance' rule."); *In re Ruggeri Elec. Contracting, Inc.,* 199 B.R. 903, 908 (Bankr.

E.D.Mich.1996) (*Begier* "can be used as a shield to protect the government from liability for a voluntary preferential payment, but it cannot be used as a sword to enable the government to effect an involuntary transfer."), *aff'd,* 214 B.R. 481 (E.D.Mich. 1997).

This Court agrees that the lowest intermediate balance test is applicable here. In cases where trust funds have been commingled with other funds, courts have applied that test to determine if the funds can be properly traced. *In re Dameron,* 155 F.3d 718, 724 (4th Cir.1998). Under this test, if the balance of cash on hand on any interim day was less than the amount of the trust fund claims, then the trust fund claims are limited to that "lowest intermediate balance." *In re Al Copeland Enters., Inc.,* 991 F.2d 233, 235 n. 1 (5th Cir.1993). Put another way, "if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust's funds will be returned in their full amount." *Dameron,* 155 F.3d at 724.

The issue before this Court is whether all of Debtor's accounts should be consolidated for purposes of applying the lowest intermediate balance test. Debtor had seven accounts—a money market account, a MasterCard/VISA account, an American Express account, an operating account, a payroll account, and two Royal Bank of Canada accounts (one U.S. and one Bahamian). The money market account was rarely used and it had negligible balances during most of the relevant period. When a user fee was charged as part of a credit card sale, the money was deposited into the Debtor's credit card accounts. The balance in the credit card accounts flowed to the operating accounts. Payrolls were funded from the operating accounts. The Bahamian account included cash sales made in the Bahamas, which included user fees.

The Trustee argues that the Bahamian account should not have been considered

by the Bankruptcy Court as part of its lowest intermediate balance analysis because the Bahamian account never contained user fees collected in the United States. The Trustee admits that the Bahamian account contained user fees. The geographical distinction that Trustee attempts to make is not a valid one. This Court agrees that all of the accounts that contained originally collected user fees, and operating accounts to which fees might have flowed, should have been considered. Since from the date of collection to the date of petition those accounts never dipped below the amount of the user fee trust claims of the INS and the USDA, the United States has adequately met its burden of tracing under the lowest intermediate balance test. *See In re Al Copeland Enters., Inc.*, 133 B.R. 837, 840 (Bankr. W.D.Tex.1991), *aff'd*, 991 F.2d 233 (1993).

The potential for manipulation of accounts would exist if Debtor's accounts, including the Bahamian operation account, were looked at separately. The lowest intermediate balance of the combined accounts never dipped below the combined amount of the INS and USDA trust claims. Therefore, the United States is granted a priority trust claim for the INS fees in the amount of $35,434 and for the USDA fees in the amount of $12,006.

**SO ORDERED.**